IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                              :
KIM WOLPERT,                  :
                              :
            Plaintiff,        :          Civil Action
                              :          No. 08-4849 (JBS/KMW)
      v.                      :
                              :
ABBOTT LABORATORIES,          :          OPINION
                              :
            Defendant.        :
_____:
```

APPEARANCES:

Bruce P. McMoran, Esq.
Michael Francis O'Connor, Esq.
Douglas Schulyer Bramley, Esq.
MCMORAN O'CONNOR & BRAMLEY
2399 Highway 34, Building D, Suite D-1
Manasquan, NJ 08736
      Counsel for Plaintiff

Jeffrey P. Catenacci, Esq.
James S. Richter, Esq.
WINSTON & STRAWN LLP
The Legal Center
One Riverfront Plaza, 7th Floor
Newark, NJ 07102
      Counsel for Defendant

**SIMANDLE**, District Judge:

# I.    INTRODUCTION

This matter comes before the Court on Defendant Abbott Laboratories' motion for summary judgment. [Docket Item 67.] Plaintiff Kim Wolpert alleges that Defendant Abbott Laboratories discriminated against her on the basis of her sex and her pregnancy in violation of the New Jersey Law Against Discrimination ("NJLAD") N.J. Stat. Ann. § 10:5-12(a), and

additionally violated her rights under the Federal Family Medical
Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. and the New Jersey
Family Leave Act ("NJFLA"), N.J. Stat. Ann. § 34:11B-1 et seq.
The undisputed facts of record demonstrate that Defendant Abbott
selected Plaintiff for termination in a nation-wide reduction in
force and notified her that her job had been eliminated while she
was on maternity leave on September 19, 2007.  As explained
below, because the undisputed facts of record indicate that
Defendant's decision to include Plaintiff in the 2007 reduction
in force ("RIF") was unrelated to her sex, pregnancy or maternity
leave, the Court will grant Defendant's motion for summary
judgment against Plaintiff's NJLAD claim based on her September
2007 termination, and also against Plaintiff's FMLA and NJFLA
claims.  However, because Plaintiff has established a dispute of
fact regarding whether Defendant's proffered non-discriminatory
reason it did not hire her for a sales position in a different
division was pretext, the Court will deny summary judgment
against that claim.

In addition to Defendant's motion for summary judgment,
Plaintiff's motion to strike portions of Defendant's reply brief
is also before the Court.  [Docket Item 101.]  Because the Court
decides Defendant's summary judgment without considering any of
the material Plaintiff moves to strike, the Court will deny this
motion as moot.

## II.   FACTS AND PROCEDURAL HISTORY

### A.   Events Prior to the September 2007 RIF

Unless otherwise identified, the following facts are supported in the record and are not disputed through admissible evidence by the parties.  Where facts are disputed, the Court will identify the dispute.

Defendant Abbott Laboratories is a health care company that develops "new medicines, new technologies, and new ways to manage health."  Munson Decl. ¶ 4.  Abbott Vascular is a division of Abbott Laboratories that focuses on treatment of vascular disease.  Id. ¶ 3.  Plaintiff Kim Wolpert began her employment at Abbott Vascular in October of 2005 as a sales representative, known in Abbott Vascular as a territory manager ("TM").  Wolpert Dep. at 5:19-22; Munson Decl. ¶¶ 8-12.  Plaintiff worked in the Endovascular group ("Endo"), which at the time was one of three sales organizations within Abbott Vascular, the other two being Vessel Closure and Cardiac Therapies.  Munson Decl. ¶ 5.  Plaintiff was initially hired to cover a territory in northern Pennsylvania.  Wolpert Dep. at 12:18-19.

In April of 2006, Abbott acquired the vascular intervention business of its former competitor, Guidant Corp.  Munson Decl. ¶ 13.  As a result, several of Abbott's sales territories, including Plaintiff's, were being covered by multiple salespeople.  Id. ¶ 14.  Thus, after the Guidant Merger, Plaintiff was relocated to cover a neighboring territory in

3

southern New Jersey, which included some of her old territory in eastern Pennsylvania.  Wolpert Dep. at 15:17-21.

In early 2007, Plaintiff informed her supervisor Bryan Finley, a Regional Manager ("RM"), that she was pregnant.  Finley Aff. ¶ 3.  Finley mentioned this news in internal e-mails. Id. ¶¶ 4-5.  On more than one occasion thereafter, Finley's manager, Area Director Bruce Tamargo, asked Finley whether Finley thought Plaintiff would return to work after her anticipated maternity leave.  Id. ¶ 8.  A few months later, in the summer of 2007, Plaintiff began reporting to a new RM, Richard Collins. Wolpert Dep. at 23:7-20.  In September of 2007, shortly after Plaintiff began her maternity leave, Collins received an email from Tamargo that suggested that the departure of two (unidentified) TMs in Collins's region had "put a strain" on the sales productivity of the region.  Tamargo e-mail, September 13, 2007, McMoran Cert. Ex. 23.

On August 14, 2007, Plaintiff received an e-mail encouraging all TMs in the Endo sales force to apply for open TM positions in the Cardiac Therapies group, in anticipation of the launch of a new product.  McMoran Cert. Ex. 14.  One such open position, which was located in Philadelphia, would report to the Cardiac Therapies RM in the region, Charles Berry.  Wolpert Dep. at 26:1-7.  Plaintiff was one of three internal candidates to interview for the position; the other two applicants were men.  Berry Dep. at 31:6-8.  The Cardiac Therapies position had the same

4

compensation structure and benefits as Plaintiff's existing position, and had the same "territory manager" title.  Wolpert Dep. at 27:9-28:8.

Plaintiff applied for the position by submitting her resume to the HR employee who sent out the notice.  McMoran Cert. Ex. 14.  There is a dispute of fact over whether Plaintiff also telephoned Berry to indicate she was applying for the position. Berry testified that she had a short telephone conversation with him regarding the position, in which she indicated that she had little interest in the position and was only applying for it because her manager suggested she do so.  Berry Dep. at 33:22-34:19.  Plaintiff denied having any direct contact with Berry prior to her interview itself.  Wolpert Dep. at 172:13-15. Regardless, Berry scheduled interviews with all three candidates who had applied, scheduling Plaintiff for a 30-minute telephone interview first, and then scheduling the other two male candidates for hour-long in-person interviews which were attended by both Berry and his superior, the Area Director of the group. Berry Dep. at 31:6-8.

Berry selected one of the male candidates for the position, who at least arguably had less sales experience at Abbott than Plaintiff did.  Berry Dep. at 44:13-48:3.  Berry testified that he made his selection on the basis of the perceived interest of the candidates in the position, and that he sensed from Plaintiff little interest both in the pre-interview conversation and in the

telephone interview itself.  Id. at 48:14-18.  Berry testified
that he believed Plaintiff had effectively taken herself out of
consideration for the position because she expressed no interest
in the job in his pre-screening conversation with her.  Id.
Plaintiff denies that she expressed no interest in the position,
though she testified that she did not remember much about what
was said in the interview.  Wolpert Dep. at 34:6-35:7.

Berry denies that he was aware in August of 2007 that
Plaintiff was pregnant.  Berry Dep. at 39:12-14.  Plaintiff
testified that he was aware of her pregnancy because he had seen
her in person in the later months of her pregnancy, when she was
visibly pregnant.  Wolpert Dep. at 172:16-22.

**B.   September 2007 RIF Criteria and Calculation Error**

In early August 2007, executives of Abbott Vascular met in
Chicago to discuss restructuring the business.  Specifically, the
executives decided that the Endo and Vessel Closure organizations
should be merged into a single group.  Munson Decl. ¶ 18.
Consequently, they decided that the sales forces of Endo and
Vessel Closure would become a single sales organization,
necessitating the elimination of close to half of the sales
employees in those organizations.  Id. ¶ 21.  Present at the
meetings were Chuck Foltz, the president of Abbott Vascular,
several vice presidents, Jean Munson, the Human Resources
Director of Abbott Vascular, and Frank "Bud" Fahey, Director of
Commercial Operations for Abbott Vascular.  Id. ¶¶ 2, 19.  Bud

Fahey's team, which included Tory Noto and Tyler Rushton of the Strategic Planning Group, was tasked with identifying and proposing objective criteria that could be used to determine which of the existing sales employees to keep and which to terminate as part of the reduction in force.  Noto Decl. ¶ 8.

Noto and Rushton developed and applied a set of criteria that they believed would select higher-performing and more experienced TMs to be "retained" in the RIF.  Id. ¶ 9.  The selection process called for first determining which and how many TMs would be considered eligible for any given territory.  Id. ¶¶ 11-14.  Secondly, the selection eliminated any eligible TMs who had a low annual performance evaluation.  Id. ¶ 15.  At the crucial third step in the process, Noto programmed an Excel spreadsheet to store and compare the "power scores" of the TMs in a given geographic region.  Id. ¶ 16

The "power score" was a numerical representation of the TM's relative nation-wide "power rank" (based on various objective sales measures) in either the Endo or Vessel Closure division. An Endo TM with a nation-wide "power rank" of 23 out of 109 TMs, for example, would have a "power score" of 0.7889, while an Endo TM with a nation-wide rank of 75 out of 109 would have a lower "power score" of 0.3119.  Id. ¶ 18.  The "power score" enabled these Endo TMs to be compared on equal footing with Vessel Closure TMs, whose power ranks were weighted slightly differently because there was a different total number of Vessel Closure

TMs.[1]  Id. ¶ 16.  Thus, a Vessel Closure TM with an apparently superior "power rank" of 22 out of 100 would have a lower "power score" than an Endo TM with a "power rank" of 23 out of 109 (0.7889 for the Endo TM compared with 0.78 for the Vessel Closure TM).  The TM with the highest power score would be selected at the third step.  Id. ¶ 25.  A final fourth step of tenure would be used to break any ties remaining.  Id. ¶ 24.  Noto then recommended one TM for each territory based on these criteria. Id. ¶ 27.

Despite these efforts at identifying the highest performers in each new geographic territory for retention, however, Noto's spreadsheet contained a calculation error that affected the results for a number of candidates.  Specifically, the formula Noto used to calculate the "power score" for the candidates incorrectly recorded the "power rank" of the various candidates, causing any zero in the power rank to drop out.  Id. ¶¶ 43-44. Thus, a candidate with a power rank of 40 would be recorded incorrectly as having a power rank of 4, and therefore an incorrectly inflated power score.  Id.

This computational error materially affected the recommendation process for eight TMs in the "final recommendations" Noto ultimately sent to Fahey on September 14,

----

[1] The parties do not direct the Court's attention to anywhere in the substantial record that identifies the total number of Vessel Closure TMs at the time of the RIF.  Therefore, for the purposes of this hypothetical explanation, the Court has used the round number of 100.

2007.  Noto Dep. 56:18-22.  Plaintiff was among the eight TMs materially affected by this error.  Specifically, her "power rank" as of the relevant date was 54 out of 109, and she was being compared against two other candidates who had "power ranks" of 100 and 107 out of 109.  Id. at 50:1-21.  Thus, absent the "zero suppression" error in Noto's spreadsheet, she would have been recommended for the territory on the basis of her superior power score.  Instead, Noto calculated the power score of Brad F., the candidate with the power rank of 100, as being based on a power rank of 1, and therefore erroneously recommended him over Plaintiff for the territory.  Id. at 57:24-58:2.

### C.   Plaintiff's Erroneous Termination

Plaintiff had contacted Munson on August 8, 2007 to request maternity leave, and began her leave in the beginning of September, 2007.  McMoran Decl. Ex. 19; Wolpert Dep. at 54:21-24.  She delivered her baby by caesarian section on September 6, 2007.  Catenacci Decl. Ex. F; Munson Dep. at 58:16-17.  There is no evidence in the record that Noto, Fahey, or any other individual associated with the creation of the RIF recommendation lists in August and September of 2007 were aware of Plaintiff's pregnancy or maternity leave.  However, there is evidence that by August 8, Joan Munson, the HR Director, was aware of Plaintiff's pregnancy and leave.  McMoran Decl. Ex. 19.

The RIF began on Sunday, September 16, 2007, with the termination of certain regional managers ("RMs").  Munson Decl. ¶

37.   Approximately ten of the twenty four RMs in the affected product lines were terminated.  Id.  Those fourteen RMs that were retained were summoned to a hotel/convention center in Atlanta, Georgia, on Tuesday, September 18, where they were informed of the RIF and organizational restructuring, and were trained on how to conduct the terminations of their TMs over the telephone the following day.  Id. ¶ 38.  Present for this training was Joan Munson as well as Kay Myrdal, who had recently been promoted into the position of Divisional Vice President of U.S. Endovascular Sales.  Id. ¶ 39; Myrdal Dep. at 13:24-14:2.  Plaintiff's Regional Manager, RM Richard Collins, was also present for the training on that day in Atlanta.  Collins Dep. at 24:15-16.  However, Bruce Tamargo, Collins's supervisor, was not present in Atlanta because he had recently been promoted to a different position.  Munson Decl. ¶ 34.  Thus, the position of Area Director for the Northeast region, the area encompassing Plaintiff's territory, had no acting Area Director at the time of the RIF.  Id. ¶¶ 34-36.

Late in the afternoon of the 18th, Tory Noto was double-checking the accuracy of the recommendation spreadsheets he had constructed.  Noto Decl. ¶ 42.  While he was conducting this review, he discovered the "zero suppression" error, and realized that it might have affected the recommendations he had provided to Fahey.  Noto Dep. at 56:18-22.  He called Fahey and explained the error.  Id. at 60:4-7.  Fahey expressed his "extreme

10

disappoinment" with Noto and requested that he determine the
magnitude of the error, by figuring out how many recommendations
were affected.  Id. at 60:14-18.  Noto corrected the spreadsheet
and determined that a total of eight territories would have
different recommendations under the correct calculation.  Later
that evening, he called Fahey back and reported how many
territories were affected.  Id. at 61:22-62:10.  He then sent
Fahey an e-mail containing this information, and listing the
territories and individual TMs that had been affected.  Id. at
63:13-14; Munson Decl. Ex. P.

    The record contains conflicting testimony regarding what
happened next.  Fahey testified that he called Munson, the HR
Director who was participating in the ongoing RIF, to report the
error "somewhere around the 18th" but does not remember when,
exactly, and does not remember whether he called Munson before or
after the TMs were called on the 19th.  Fahey Dep. at 45:7-17,
68:18-20.  Munson testified that she was not made aware of the
existence of the error until several months later, in December of
2007.  Munson Dep. Vol. 2. at 84:13.

    Fahey testified that in his initial conversation with
Munson, which may or may not have happened as early as the
evening of September 18, he discussed with her whether or not
they should reverse course on the terminations to correct the
errors, or whether they should "stay the course."  Fahey Dep. at
46:12-19.  However, he did not convey the identities of any of

11

the affected individuals, including Plaintiff.  Id. at 48:4-9
("We were talking about the larger issue. I was not focused on
the individuals.").

Myrdal, the new Vice President of Endovascular Sales,
testified that she did not learn about the error in producing the
list of recommended terminations prior to the RIF.  Myrdal Dep.
at 44:7-9.  She testified that on the evening of the 18th, prior
to presenting the list of TMs who would be terminated to the RMs,
she showed the list to the Area Directors who were present in
Atlanta.  Id. at 50:24-53:13.  The Area Directors then made
additional changes to the list of TMs in each of their areas,
based on factors such as geography and tenure.  Id. at 52:7-56:24
Myrdal also explained that there was no Area Director
scrutinizing the Northeast territories, where Plaintiff was
located, because that position was vacant at the time.  Id. at
64:24-64:2.

Myrdal communicated these changes to Munson, id. at 51:16-
53:21, who compiled a revised spreadsheet reflecting the changes
and subsequently e-mailed a list of the final last-minute changes
to other employees within Human Resources at approximately 12:30
a.m. on Wednesday, September 19.  Munson Decl. Ex. K, Catenacci
Decl. Ex. P.  Munson testified that she had played no part these
last-minute changes, but was merely told to make them by Myrdal.
Munson Dep. at 52:24-53:9.  Some of the employees included in
this list sent from Munson were individuals who had been

identified as erroneously impacted by Tory Noto earlier in the
evening, but there is no evidence in the record that the specific
individuals identified by Noto were communicated at any time on
the 18th or 19th to either Munson or Myrdal.

At approximately 11:30 p.m. on the night of September 18,
the RMs were finally presented with the list of impacted TMs that
they were assigned to contact and inform of their termination the
following day.  Collins Dep. at 26:18-19.  Richard Collins
received his list of impacted TMs and noticed Plaintiff's name on
the list.  He testified that he sought out Myrdal and informed
her and Munson that Plaintiff had just given birth and was still
on maternity leave.  Id. at 37:19-38:4.

Collins testified that Munson responded to his concerns with
terminating Plaintiff by saying "She's dodged the bullet once
before, fire her."  Id. at 39:16-17.  Collins said Munson did not
explain what she meant by this, but he understood her to be
referring to the time in 2006 when Plaintiff was transferred to
New Jersey from Pennsylvania rather than be simply terminated.
Id. at 45:2-3; 142:15-25.  Munson denies having said this, and
testified that she did not recall speaking to Collins on the
night of the 18th at all.  Munson Dep. at 62:9-18; 66:13.

On the morning of Wednesday, September 19, 2007, Collins
called the TMs on his list, including Plaintiff, and notified
them of their termination.  Collins Dep. at 56:12-15.  On the
same day, Collins called the TMs in his region that were being

13

retained as well, to let them know that the RIF had happened but they were being retained.  Id. at 57:1-7.

### D.   **Aftermath**

Plaintiff remained on maternity leave until November 1, 2007.  Wolpert Dep. at 95:15-25, 96:1-4.  At the end of her maternity leave, she began a 60-day "pay continuation leave" during which time she retained her salary and benefits.  Id. at 97:17-25, 98:1-7.  During this time, she was sent multiple e-mails listing open positions within Abbott for which she (along with other terminated employees) was invited to apply.  Munson Decl. Exs. M, N, & O.  Plaintiff did not apply for any of these positions, nor does she remember having received the e-mails.  Wolpert Dep. at 85:17-86:2.  On January 2, 2008, Plaintiff's "pay continuation leave" ended and she was officially terminated.  After learning of the "zero suppression" calculation error, Abbott did not offer to correct its error and award her the position it had presented to a lower-performing male employee prior to the end of her "pay continuation leave".  O'Connor Cert. ¶ 8, attached to Pl.'s Motion to Strike.

Of the eight individuals materially affected by the "zero suppression" error, four of them, including Plaintiff, were not reinstated to any position within Abbott.  Munson Decl. ¶¶ 49. Two of the original eight had been moved from "impacted" to "retained" by Myrdal and the area directors on the evening of September 18.  Catenacci Decl. Ex. P.  Two more were ultimately

14

reinstated some time after September 18 to the positions they had been denied after the individuals originally retained voluntarily departed or took other positions.  Munson Decl. ¶¶ 50-51.  Of the four employees erroneously terminated and not reinstated, two were male, two were female (including Plaintiff), and Plaintiff was the only one on maternity leave.  Munson Decl. ¶ 49.  In the course of the September 2007 RIF, approximately 111 employees were terminated.  Munson Decl. ¶¶ 41-42.  There was only one other TM on maternity leave in the affected business units at the time of the RIF, and she was not terminated.  Munson Decl. ¶ 44.

### E.   Procedural History

Plaintiff commenced this action on June 12, 2008, in the Superior Court of New Jersey, Gloucester County, and Defendant removed to this Court on September 29, 2008. [Docket Item 1.]  On March 24, 2009, Plaintiff filed her Amended Complaint. [Docket Item 23.]  Defendant filed the instant motion for summary judgment on February 3, 2011, and the motion was fully briefed by April 11, 2011.  On April 14, 2011, Plaintiff filed a motion to strike statements made in Defendant's reply brief and supporting materials. [Docket Item 101.]  That motion was fully briefed on May 6, 2011.

## III. DISCUSSION

### A.  Standard of Review

15

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact.  Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

> [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex, 477 U.S. at 323.

However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  See also Scott v. Harris, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

**B.   Analysis**

1.   NJLAD Claims

Plaintiff seeks recovery for several different acts of alleged discrimination under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12(a).  Specifically, Plaintiff has claimed that Abbott's failure to hire her for the Cardiac Therapies position under Charles Berry in August of 2007, and its decision to terminate her employment in the September 2007 RIF were both acts of sex and pregnancy discrimination under the NJLAD.  New Jersey courts have held that discrimination on the basis of pregnancy is actionable as a form of sex discrimination under NJLAD.  McConnell v. State Farm Mutual Ins. Co., 61 F. Supp. 2d 356, 362 (D.N.J. 1999) (citing Castellano v. Linden Board of Education, 158 N.J. Super. 350 (App. Div. 1978), modified on other grounds by 79 N.J. 407 (1979); Leahey v. Singer Sewing Co., 302 N.J. Super. 68 (L. Div. 1996)).

When a plaintiff seeks to prove a claim of employment discrimination under the NJLAD in the absence of direct evidence

17

of discrimination, New Jersey and Federal Courts analyze the claim under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>McConnell</u>, 61 F. Supp. 2d at 362 (citing <u>Erickson v. Marsh and McLennan Co.</u>, 117 N.J. 539, 549-550 (1990)).

Under this framework, the plaintiff has the initial burden of presenting a prima facie case of discrimination, after which the burden shifts to defendant to come forward with evidence demonstrating that the employment action was taken for a legitimate, non-discriminatory reason, and then the burden shifts back to plaintiff to demonstrate that the defendant's non-discriminatory reason is pretext.  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).

In the present case, the parties agree on the relevant elements that Plaintiff must establish to meet her initial burden under the framework.  "The elements comprising the traditional formulation of the prima facie case for discrimination are that: (1) plaintiff belongs to a protected class; (2) she was performing her job at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions."  <u>El-Sioufi v. St. Peter's University Hosp.</u>, 382 N.J. Super. 145, 167 (App. Div. 2005).

a. August 2007 Cardiac Therapies application

Defendant argues that Plaintiff both fails to establish a prima facie case of discrimination for her claim of discrimination in August 2007, and that she fails to raise an issue of fact regarding whether defendant's non-discriminatory reason is pretext.

With regard to the prima facie case, Defendant argues that Plaintiff cannot point to a dispute of fact over whether Abbott's failure to hire her for the Cardiac Therapies TM position was an adverse employment action. Plaintiff responds that, because her then-existing position as TM in Endo was eliminated less than a month after she was denied the Cardiac Therapies position, the failure to hire her constituted an adverse employment action.

The Court finds, however, that Plaintiff's claim that she was not hired for the Cardiac Therapies position in August of 2007 is not a discriminatory termination claim, as Defendant has argued, but is, in fact, a "failure to hire" claim. See Am. Compl. ¶¶ 36-43. A Plaintiff's prima facie elements in a failure to hire claim are slightly different. See Fuentes, 32 F.3d at 763 (listing elements of failure to hire claim as "(i) that [plaintiff] belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from

persons of complainant's qualifications"). Thus, it is
irrelevant to Plaintiff's failure to hire claim whether or not
she can point to a dispute of fact over whether Abbott's failure
to hire her for the Cardiac Therapies TM position was an "adverse
employment action." In the context of a claim, like Plaintiff's,
where the plaintiff seeks out and applies for a new position for
which she was qualified and was denied in circumstances that
raise a presumption of discrimination, the fact that the position
to which she applied did not have greater compensation or
benefits is immaterial to the claim. The cases cited by
Defendant on this point, requiring evidence of an adverse
employment action to state a claim for discrimination, all
involve accusations by the plaintiff that an involuntary transfer
constituted employment discrimination. See Swangin v. Public
Schoos of Edison Township, Civ. No. 03-4058, 2007 WL 1302486, at
*11 (D.N.J., Apr. 30, 2007) (finding no adverse employment action
in involuntary transfer); Scott v. New Jersey, 143 F. App'x 443,
446 (3d Cir. 2005) (same); DiCampli v. Korman Communities, 257 F.
App'x 497, 499 (3d Cir. 2007) (same).

In the present case, Plaintiff is claiming, instead, that
she voluntarily applied to a different position from the one she
was working, and was denied for a discriminatory reason. Courts
that have considered that form of claim have not required the
plaintiff to provide evidence that the position to which she
applied was superior in terms of benefits or compensation to what

the plaintiff was currently working.  See Waris v. Heartland Home Healthcare Servs., 365 F. App'x 402, 404 (3d Cir. 2010) (requiring plaintiff only establish that "he was rejected despite being qualified" rather than suffering an adverse employment action in failure to hire case).  Thus, the Court holds, Plaintiff need not point to a dispute of fact over whether the Cardiac Therapies position to which she applied was superior in terms of compensation or benefits to state a prima facie case for discrimination.

On a motion for summary judgment, it is the movant's burden to "show[] that there is no genuine dispute as to any material fact" in the non-movant's case.  Fed. R. Civ. P. 56(a).  Here, Defendant has not shown that there is no dispute of fact over the appropriate elements in a failure to hire claim.  Thus, the Court cannot enter summary judgment against Plaintiff's failure to hire claim on the basis of her prima facie claim.

Defendant goes on to argue that, even if she has established a prima facie claim, Plaintiff cannot point to a dispute of fact over whether Defendant's legitimate, non-discriminatory reason for hiring an allegedly less-experienced male applicant was pretext.  Defendant argues that Charles Berry's decision not to hire Plaintiff for the position was based on her initial pre-interview telephone call in which, he claims, she expressed disinterest in the position.  Berry Dep. at 34:1-35:4.  He explained that he scheduled in-person interviews with the other

21

two (male) candidates because they expressed interest in the
position in pre-screening telephone calls, but that because
Plaintiff's pre-screening telephone call indicated that she was
only applying for the job at her manager's suggestion, he did not
seriously consider her for the position and therefore only
scheduled her for a "courtesy" telephone interview.  Id. at
38:19-25.  He also testified that he was not aware, at the time
that he filled the position, that Plaintiff was pregnant.  Id. at
39:12-14.

Plaintiff testified, by contrast, that her phone interview
was the first time she spoke on the telephone with Berry; she did
not have any other conversation with him prior to the interview.
Wolpert Dep. at 35:8-12; 172:13-15.  She further testified that
Berry knew, at the time she applied for the position, that she
was pregnant because he had seen her, presumably at a time when
she was visibly pregnant.  Id. at 172:20-22.  The Court finds
Plaintiff's testimony on these points to both raise a dispute of
fact.  If the factfinder were to credit Plaintiff's testimony
regarding the scheduling of the interview, the factfinder could
conclude that Berry decided not to grant Plaintiff an interview
only on the basis of her resume or some other factor.  If the
factfinder were to credit Plaintiff's testimony regarding her
pregnancy, it could conclude that Berry had seen visible evidence
of Plaintiff's pregnancy, and thus knew that she was pregnant.
Thus, were a factfinder to credit Plaintiff's testimony over

22

Berry's, the factfinder could conclude on this testimony that Berry decided, before even speaking to Plaintiff, that he would only grant her a 30-minute phone interview instead of the hour-long interviews he granted to two other male candidates, one of whom he hired for the position.

The Court therefore concludes that Plaintiff has raised an issue of fact regarding whether or not Berry decided to not seriously consider her as an applicant for the position (by granting her an in-person interview) because she indicated disinterest in a pre-screening interview, or whether he instead did so due to her pregnancy or sex.  This dispute of fact regarding Defendant's proffered non-discriminatory reason to not offer her the position is sufficient to raise an issue of fact regarding pretext.  The Third Circuit has held that "[t]he factfinder's rejection of the employer's proffered, legitimate reason permits, but does not compel, a verdict for the plaintiff."  Fuentes v. Perskie, 32 F.3d at 763.  That is sufficient for Plaintiff to survive Defendant's motion for summary judgment on this claim.

b.  Plaintiff's termination in the RIF

Plaintiff also claims that her termination in the September 2007 RIF constituted discrimination.  Defendant does not dispute that Plaintiff can establish a prima facie case of discrimination, and instead, argues that Plaintiff fails to

establish a dispute of fact over whether Defendant's non-discriminatory reason for terminating Plaintiff was pretext.

Plaintiff claims that Defendant's decision to retain a male TM with a lower power score over Plaintiff constituted discrimination on the basis of sex and pregnancy. Defendant claims that it terminated Plaintiff for a legitimate, non-discriminatory (if mistaken) reason. Namely, Defendant argues that the record demonstrates that Plaintiff was selected for termination in the September 2007 RIF because the spreadsheet used to calculate and compare power scores of all Endo TMs had a calculation error which showed Plaintiff with a lower power score than another male TM in her region, even though Plaintiff's properly calculated power score would have been higher. Defendant further argues that there is no dispute in the record that Munson, Myrdal, and Collins, the Abbott agents responsible for carrying out the RIF on September 19, 2007, were unaware that Plaintiff had been incorrectly selected for termination. The Third Circuit has previously held that terminations on the basis of economically-based reductions in force, that select candidates based on objective criteria, constitute a legitimate non-discriminatory reason for the termination. See Francis v. Pueblo Xtra Int'l, Inc., 412 F. App'x 470, 474 (3d Cir. 2010). Additionally, the Third Circuit has held that a plaintiff must do more to show pretext than show that the employer was mistaken in the application of objective criteria. Fuentes, 32 F.3d at 765

24

("To discredit the employer's proffered reason, however, the
plaintiff cannot simply show that the employer's decision was
wrong or mistaken, since the factual dispute at issue is whether
discriminatory animus motivated the employer, not whether the
employer is wise, shrewd, prudent, or competent.")

Plaintiff argues that Defendant's decision to terminate
Plaintiff was not merely mistaken, but the result of
discriminatory animus, therefore establishing a dispute of fact
in the record sufficient to permit a factfinder to find this
justification to be pretext.  Specifically, Plaintiff states that
a jury could conclude, on the basis of Fahey's testimony, that
Fahey informed Munson on the evening of September 18 that there
was an error affecting Plaintiff and seven other employees, which
could be corrected prior to the termination calls on September
19.  Further, Plaintiff argues that Munson's subsequent e-mails
in the evening of September 18 and after midnight on September 19
would permit a factfinder to conclude that Munson had acted on
this information and "saved" several of the wrongly impacted
employees, but not Plaintiff.  Plaintiff suggests that, from
these facts, a jury could therefore conclude that Munson must
have chosen not to "save" Plaintiff from erroneous termination on
September 19 due to a discriminatory motive.

The Court finds that the record does not permit such a
conclusion.  To avoid summary judgment at the pretext stage,
Plaintiff must put forward "such weaknesses, implausibilities,

25

inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a
reasonable factfinder <u>could</u> rationally find them unworthy of
credence." <u>Fuentes</u>, 32 F.3d at 765 (internal quotation and
citation omitted; emphasis in the original).  Plaintiff has not
met this burden here.

First, the Court finds that there is no evidence in the
record from which a jury could find that Munson was informed of
the identities of any individuals who were impacted by the
calculation error.  Assuming that a jury could reasonably
determine, on the basis of Fahey's equivocal testimony, that
Fahey contacted Munson on the evening of September 18 to discuss
the existence of the calculation error, there is no evidence in
the record that Fahey communicated the names of those affected to
Munson.  Fahey testified that his initial conversation with
Munson did not discuss the individuals affected, but was "about
the larger issue" of the fact of an error in the first place.
Fahey Dep. at 48:7-9.  There is, further, no record of Munson
receiving any e-mail containing the impacted individuals or of
Fahey or Noto sending the list to anyone else.  Thus, no
reasonable factfinder could conclude based on this record, that
Munson (or anyone else involved in the execution of the RIF in
Atlanta on September 19) knew that Plaintiff should not have been
terminated based on the objective criteria.

26

The late-night e-mail sent by Munson "saving" two of the erroneously impacted TMs does not change this fact.  The undisputed testimony of record, from both Munson and Myrdal, is that the individuals on that list were changed as a result of the requests of the area directors in conversation with Myrdal. Munson had no input into those decisions and was merely reporting the decisions that had been communicated to her.  Plaintiff's speculation that Munson must have known about the error and acted to save certain of the employees impacted is merely that, speculation, which is insufficient to survive summary judgment. See Kautz v. Met-Pro Corp., 412 F.3d 463, 472 (3d Cir. 2005) (holding that pretext cannot be established "by mere speculation, intuition, or guessing.").

Plaintiff further argues that pretext is established by the fact that, even after Defendant's agents admittedly learned of the calculation error later in 2007, they never offered to reinstate Plaintiff or to offer her the position offered to the male employee with the lower power score.[2]  However, the Court concludes that this fact does not discredit Defendant's explanation or raise an inference of discrimination in this case

---

[2] Defendant also responds to this argument as though Plaintiff were raising an independent claim of discrimination on the basis of Defendant's failure to reinstate.  The Court does not interpret Plaintiff to make such a claim in her opposition brief, but, to the extent that her argument can be interpreted to have done so, agrees with Defendant that a plaintiff cannot amend the complaint to raise new claims through a brief opposing summary judgment.  See Bell v. City of Philadelphia, 275 F. App'x 157, 160 (3d Cir. 2008).

because, in addition to Plaintiff, three other high-performing employees, two of which were males, were also not reinstated despite the discovery of the error.

Indeed, the record demonstrates that the only erroneously impacted employees to be reinstated to positions after the RIF were reinstated because the employees who were erroneously selected chose not to accept the offered positions.  Munson Decl. ¶¶ 50-51.  Thus, the record does not include any evidence from which a rational factfinder could reasonably conclude Plaintiff was terminated in the RIF due to discrimination.  The Court will, therefore, grant Defendant's motion for summary judgment against Plaintiff's discrimination claim for her termination in the September 2007 RIF.[3]

    2.   FMLA and NJFLA Claims

In addition to her NJLAD discrimination claims, Plaintiff also claims that Defendant's decision to terminate her in the September 2007 RIF, while she was out on maternity leave, violated her rights under the FMLA and the NJFLA.

_____

    [3] Defendant additionally argues that summary judgment should be entered against Plaintiff's claim of discrimination due to her 2006 transfer from Pennsylvania to New Jersey.  Plaintiff does not respond to this argument, and the Court is not convinced that Plaintiff has claimed discrimination on this basis in her Amended Complaint.  However, because the Court agrees with Defendant's argument that Plaintiff cannot establish either a prima facie case for discrimination or pretext for Defendant's non-discriminatory reason for the transfer, the Court will grant summary judgment against any claim of discrimination due to Plaintiff's 2006 transfer.

Both the FMLA and the NJFLA provide eligible employees with up to twelve weeks of protected leave after the birth of a child. See 29 U.S.C. § 2612(a)(1)(A) (eligible employee entitled to "a total of twelve workweeks of leave during any twelve-month period . . . [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter"); N.J. Stat. Ann. § 34:11B-4b (eligible employee entitled to "a family leave of 12 weeks in any 24-month period upon advance notice to the employer . . . [i]n the case of the birth or adoption of a healthy child . . . ."). Both statutes require that an employee taking qualified leave is entitled to return to her previous position or a comparable position "with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1); N.J. Stat. Ann. § 34:11B-7.

Due to the similarity of the statutes, courts apply the same standards and framework to claims under the FMLA and the NJFLA. See Santosuosso v. NovaCare Rehabilitation, 462 F. Supp. 2d 590, 596 (D.N.J. 2006). Under both statutes, an aggrieved Plaintiff can seek recovery under an entitlement theory or a retaliation theory. Id. at 596-97.

a.   Entitlement theory

An employee is entitled, pursuant to the FMLA and NJFLA, to return from qualified leave to his or her former position, or to an equivalent one. Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004). However, this entitlement to

restoration is qualified under both statutes.  The FMLA states that it does not entitle a restored employee to a right, benefit or position to which the employee would not "have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B).  Thus, when an employer can show that "an employee would have been laid off during the FMLA leave period" independent of the employee's leave, the employee will not be entitled to restoration.  29 C.F.R. § 825.216(a)(1).  Similarly, under the NJFLA,

> [i]f during a leave provided by this act, the employer experiences a reduction in force or layoff and the employee would have lost his position had the employee not been on leave, as a result of the reduction in force or pursuant to the good faith operation of a bona fide layoff and recall system including a system under a collective bargaining agreement where applicable, the employee shall not be entitled to reinstatement to the former or an equivalent position.

N.J. Stat. Ann. 34:11B-7.  It is the employer's burden to prove that the employee's position would have been eliminated in the reduction in force.  Parker v. Hanhemann University Hosp., 234 F. Supp. 2d 478, 487 (D.N.J. 2002).

Defendant argues that, because the record demonstrates that Plaintiff would have been terminated in the RIF whether or not she was on leave at the time of the RIF, she was not entitled to reinstatement at the end of her qualified leave.  Plaintiff responds that, first, Defendant cannot prove that she would have been terminated absent her maternity leave, for substantially the

same reasons that she claimed pretext under her NJLAD claim. Secondly, Plaintiff argues that, pursuant to Parker v. Hanhemann, Defendant is required to prove <u>both</u> that Plaintiff would have been terminated even had she not been on leave <u>and</u> that upon conclusion of her leave, Defendant offered her reinstatement in an equivalent position. <u>See Id.</u> at 489 ("For defendants to show that plaintiff was not entitled to reinstatement, they must show (1) that the position plaintiff held before leave would have been eliminated even if she had never taken the FMLA leave . . . , and (2) that it offered plaintiff reinstatement in an equivalent position that she chose not to accept"). Thus, Plaintiff argues, because Defendant cannot establish that it offered to reinstate Plaintiff in an equivalent position that she chose not to accept after the conclusion of her maternity leave, Defendant is not entitled to summary judgment on this point.

The Court first finds that Plaintiff's reading of Parker is an incorrect statement of Defendant's burden under the FMLA, which states that "[n]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." § 2614(a)(3)(B). Were the Court to interpret the statute to require an employer to offer an equivalent position to an employee whose position was legitimately eliminated in a reduction in force unrelated to the

employee's leave, such an interpretation would entitle that employee to a right not otherwise available had the employee not taken the leave.  In other words, if Plaintiff, simply by virtue of the fact that she was taking maternity leave during the RIF, were entitled to demand from Defendant an equivalent position upon returning from her leave, she would have gained an entitlement beyond the other employees terminated in the RIF who were not taking maternity leave, which would run afoul of § 2614(a)(3)(B).  Consequently, the Court concludes that to defeat Plaintiff's entitlement claim, Defendant need only demonstrate the absence of a dispute of fact that Plaintiff would have been terminated in the RIF even if she were not on maternity leave.

Second, the Court agrees with Defendant that there is no dispute of fact in the record that Plaintiff would have been terminated in the September RIF even had she not been on maternity leave at the time of the RIF.  As discussed above, the record indicates that Plaintiff's selection for termination was due to the calculation error, which applied equally to employees not on leave as well as Plaintiff.  Additionally, the record indicates that, prior to notifying Plaintiff of her termination on September 19, neither Munson nor Myrdal knew that Plaintiff had been affected by the error.  Finally, the Court also notes that the only other Abbottt Vascular employee on maternity leave during the RIF was not terminated, and that more than 100 other

Abbott Vascular employees not taking FMLA leave were terminated at the same time as Plaintiff for substantially the same reasons.

> b.  Retaliation theory

Plaintiff also claims violation of the FMLA and NJFLA on the basis of a retaliation theory.  The retaliation theory of recovery protects employees from suffering discrimination because they have exercised their rights under the FMLA.  Parker, 234 F. Supp. 2d 488-89.  This theory of recovery is based on the "proscriptive rights" of the FMLA which prevent an employer from discriminating against employees and prospective employees who have taken FMLA leave. 29 U.S.C. § 2615(a)(2);[4] N.J. Stat. Ann. § 34:11B-9.

The issues in a claim brought under this theory are similar to those raised in cases alleging other types of employment discrimination.  The employer's motive is relevant, and the employer can defend its action as one based on a legitimate nondiscriminatory reason.  Lepore v. Lanvision Systems, Inc., 113 F. App'x 449, 453 (3d Cir. 2004).  In cases under the retaliation theory, therefore, courts apply the same McDonnell Douglas burden shifting as was applied the discrimination claims discussed above.  Id.

---

[4] 29 U.S.C. § 2615(a)(2) provides: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

33

To establish a prima facie case in a retaliation claim, Plaintiff must point to at least a dispute of fact that "(1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave." Id. citing Conoshenti v. Public Svc. Elec. & Gas Co., 364 F.3d 135 (3d Cir. 2004).

Defendant argues that Plaintiff cannot point to a dispute of fact that Plaintiff's termination was causally related to her leave. Plaintiff argues that the temporal proximity of the termination following her request for and commencement of her leave establishes a dispute of fact over the causal nexus. Parker, 234 F. Supp. 2d at 492 (finding that very close temporal proximity can be "unduly suggestive and satisfies the causation element of plaintiff's prima facie case at the summary judgment stage") (internal quotations omitted).

The Court finds that Plaintiff's temporal proximity evidence is not applicable in the instant case, where Plaintiff was terminated along with more than 100 other employees. Plaintiff can point to no evidence in the record indicating that the timing of this nation-wide RIF was scheduled in response to -- or had any relation to -- Plaintiff's beginning her maternity leave more than two weeks prior. This situation is quite different from that encountered in Parker, where the Plaintiff was the only individual fired, and she was fired on the same day that she returned from her maternity leave. 234 F. Supp. 2d at 492.

In addition, even if the Court were to find that Plaintiff had satisfied her prima facie case, the Court would be compelled to conclude, for substantially the same reasons listed above in the NJLAD discussion, that Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination that Plaintiff has not rebutted as pretext.  Consequently, the Court concludes that it must grant Defendant's motion for summary judgment against Plaintiff's retaliation claims.

### C.   Motion to Strike

Plaintiff has filed in this matter a motion to strike portions of Defendant's reply brief and supporting materials. Specifically, Plaintiff moves to strike Defendant's proffer of evidence that Defendant offered Plaintiff a position elsewhere in Abbott during the course of settlement negotiations.  Defendant offered this evidence, contained in the Declaration of Dana Deane, to rebut Plaintiff's argument that pretext is shown through the fact that Defendant never offered to reinstate Plaintiff to her previous TM position after discovering the calculation error that resulted in her termination.

The Court has determined that Plaintiff failed to establish pretext independent of this evidence.  Therefore, the evidence played no role in the Court's determination that summary judgment was warranted with regard to Plaintiff's NJLAD claim based on the September 2007 RIF and Plaintiff's retaliation claim.  The Court will, as a result, deny Plaintiff's motion as moot.

35

## IV.   CONCLUSION

For the reasons stated above, the Court has concluded that summary judgment is warranted against Plaintiff's NJLAD claim for discriminatory termination in the September 2007 RIF, and also against Plaintiff's FMLA and NJFLA claims under both the entitlement and retaliation theories.  Summary judgment is also warranted against Plaintiff's claim of discrimination due to Plaintiff's 2006 transfer.  However, the Court has determined that summary judgment is not warranted against Plaintiff's NJLAD failure to hire claim based on Plaintiff's August 2007 Cardiac Therapies application.  Consequently, the Court will grant in part and deny in part Defendant's motion for summary judgment.  Finally, because the Court did not consider the contested evidence, the Court will deny Plaintiff's motion to strike as moot.  The accompanying Order shall be entered.


**September 12, 2011**                         **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         U.S. District Judge